# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs September 14, 2023

## SARAH EDGE WOODWARD v. GEOFFREY HAMILTON WOODWARD

**Appeal from the Circuit Court for Davidson County**
**No. 21D-825      Phillip R. Robinson, Judge**

_____

### No. M2023-01298-COA-T10B-CV

_____

In this ongoing divorce litigation, the father filed an interlocutory appeal from the trial court's denial of his motions to recuse the trial judge. Having reviewed father's petition under the required de novo standard, we affirm the trial court's decision.

**Tenn. Sup. Ct. R. 10B Interlocutory Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Larry Hayes, Jr., Rachel M. Thomas, William T. Ramsey, J. Isaac Sanders, Callie K. Hinson, and Benjamin C. Aaron, Nashville, Tennessee, for the appellant, Geoffrey Hamilton Woodward.

Helen Sfikas Rogers and Laura Schumacher Blum, Nashville, Tennessee, for the appellee, Sarah Edge Woodward.

### OPINION

#### FACTUAL AND PROCEDURAL BACKGROUND

The case underlying this appeal is a highly contentious divorce. Sarah Edge Woodward ("Mother" or "Wife") and Geoffrey Hamilton Woodward ("Father" or "Husband") married in 2001 and had three children, Sarah (born in 2003), Geoffrey (born in 2004), and William (born in 2006). Mother filed a petition for divorce in May 2021 alleging grounds of irreconcilable differences and inappropriate marital conduct. At that time, both Geoffrey and William were under eighteen years of age. Geoffrey turned eighteen in 2022.

From the beginning, the divorce proceedings were characterized by conflict concerning the parties' parenting of their two minor children, and this conflict led to numerous hearings. In order to consider Father's appeal, we must outline the progression of events in some detail. Our summary will include statements made by the trial judge that are cited by Father in his appellate brief.[1]

### Motion regarding possession of marital home

On July 16, 2021, Mother filed a Motion for Exclusive Possession of Master Bedroom, which was heard on July 30, 2021. Before hearing any testimony, the court made some introductory comments about the divorce process and the importance of insulating the children from the divorce proceedings and obeying the court's orders. In this context, the court made the following comments:

> I am not going to put either one of you-all in a situation where you're constantly subjected to any type of inappropriate behavior from the other party, and I'm not going to put your children in that situation. If you want to be alienated from your children by the Court, if you want to be removed from your children's lives, then just disobey my orders, because that's exactly what I'll do.

> And I'm going to put some orders down in a few minutes and you-all are going to comply with them, and if you don't -- listen to me – I'm going to put you in jail, and I don't care how smart you are, how much money you make, or how many letters you have got after your name. I'm going to put you in jail because you're not going to do that to these children.

Both parties then proceeded to testify.

Mother testified that Father told the children that Mother was "leaving them" and that he would stop the divorce. During Mother's testimony, her attorney played audio recordings of incidents that occurred on July 16 and July 23, 2021, and provided the court with transcripts of the recordings.[2] During the second incident, Father and the two older children confronted Mother about the divorce. After hearing part of the second recording, the court asked Mother's attorney: "Is there something specific you're wanting the Court to hear at this point? I'm kind of sick at my stomach listening to this." Mother described the July 23, 2021 incident further:

---

[1] Due to some of the matters cited by Father, this Court considered it necessary to put the trial court's statements in context and, therefore, some of the facts are derived from sealed materials.

[2] The recordings and transcripts of these incidents are not included in the appellate record.

[T]he conversation started in the kitchen. I immediately said – didn't even say. I grabbed my keys and my purse and I went outside. I park the car in the front driveway. I tried to get in the car and was surrounded by my husband and the two -- the two older children who blocked the door and shoved me.

Addressing the July 23, 2021 incident, Father testified that "the children were very upset about what was happening and that their mother was going to throw their father out of the house." Father acknowledged that he had read part of Mother's motion to the children and that they had behaved inappropriately toward their mother during the incident.

After hearing the proof, the court admonished both parents not to "undermine the other [parent's] authority in the presence of the children." The court expressed hope that "tomorrow is going to start a new day in this case," but also stated that, "I'm very disheartened about these conversations that I've heard audio recordings of and these transcripts." The court requested and received Father's assurances that there would be no more incidents of berating Mother for wanting a divorce.

The court entered an order on August 19, 2021, granting Mother's motion and awarding her exclusive possession of the marital home. The two minor children were to continue residing at the marital home, and Father was not to communicate with them after 9:00 p.m. each day. The parties' attorneys were to work out an agreed parenting schedule. Further, the parties would agree on a counselor for the minor children, and the parents would participate in family counseling with the children. The order further provided:

> Both parties are <u>enjoined</u> and <u>restrained</u> from having conversations regarding parenting in the presence of the children; undermining the other parent's authority in the presence of the children; talking about the divorce, or allowing any third party to talk about the divorce in the presence of the children; and from bullying, threatening, or name-calling one another via email, text message, or verbally.

(Emphasis in original).

On August 3, 2021, Father filed an answer and countercomplaint asserting irreconcilable differences and inappropriate marital conduct. He proposed a parenting plan designating him as the primary residential parent.

### Rule 35 forensic evaluator

On August 23, 2021, the court held a telephonic hearing on Mother's Emergency Motion to Appoint Dr. Bradley Freeman to evaluate the children and the parties. The parties agreed to the appointment of Dr. Katie Spirko to serve as an expert, pursuant to

Tenn. R. Civ. P. 35,[3] to evaluate the parties and the two minor children. The court entered an order on September 5, 2021, providing for the approval of Dr. Spirko as a Rule 35 expert and setting forth the procedure for the scheduling of interviews with Dr. Spirko. In its September 5, 2021 order, the court also modified a previous order (dated August 19, 2021) to state that "the parties and children shall not be required to attend family counseling at this time, as it appears that efforts to co-parent will not be immediately successful." William would be permitted to see Dr. Jay Woodman for counseling.

Pendente lite parenting time

Mother filed a motion for pendente lite parenting time, and the trial court held a hearing on the motion on September 24, 2021. Counsel for Mother reported to the court that Father had failed to comply with the court's orders regarding the marital home and parenting time. In response, the court then had the following colloquy with Mother's attorney:

> THE COURT: Is there a contempt petition pending?
> MS. ROGERS: No. We'll get to all of those, I'm sure. I really just want to straighten out what we're doing with the child because this free-for-all really has to end.
> THE COURT: Well, but here's one of the things the Court has to deal with, Ms. Rogers. Appearance is unfortunately important. When we have people sitting in the back of the courtroom and they hear the Court has put down the orders and they're being flaunted and nobody is doing anything about it -- I can't go over there and watch every time he drives on the property and have the police take him into custody. So the only way I can uphold my order is if you file a criminal contempt against him.
> MS. ROGERS: I promise you, we'll get to criminal contempt.
> THE COURT: And then I'm going to do it, but we've got -- it doesn't do much good for you-all to complain about things because I'm not going to put down a separate order. One order ought to suffice for these people. They're educated people, and if they're violating it and you-all choose not to file contempt petitions, don't complain about it until you file one. And then I don't put them in jail and you say, gee, Judge, you didn't enforce your own order. I'll moan and groan and probably give some excuse. But file a contempt if you want these orders enforced.

After hearing arguments from the attorneys, the court heard testimony from Dr. Spirko, who had interviewed both parents. She had interviewed Mother for two and a half

---

[3] Tennessee Rule of Civil Procedure 35.01 provides that, "[w]hen the mental or physical condition . . . of a party . . . is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner . . . ."

- 4 -

hours, and Father for four hours and had observed one interaction between Father and William during the interview. Dr. Spirko had not yet interviewed either of the minor children. She acknowledged that she had "not yet observed either parent's parenting, and so I can't really speak to their parenting in terms of what they say."

Dr. Spirko was asked about an incident when, after the initial court hearing, the two sons returned to the marital home and poured milk over Mother's clothing in her drawers and closet. Dr. Spirko discussed the incident with Father, who stated that he took the two boys golfing immediately after the incident. Dr. Spirko testified:

> A. . . . [Father] came in and tried to clean it up the best that he could and then took the children to go golfing and that he did not believe they should be punished for it, that they needed love and comfort because the Court had essentially – the Court and their mother had caused them to have the worst day of their life and that that was just to be expected that they would act out because they were hurting so much.
> So during the golf trip the mother called and said that he needed – she needed the kids brought home immediately, and so he brought them home.
> I asked him if he had it all to do over again, if he would have done anything differently. He said, no, he thinks he handled it perfectly. I asked him if he felt like the kids should have been punished for that or disciplined in any way. He said no, absolutely not.
> And I asked if he felt that Mom deserved for that to happen to her. He kind of hesitated, hedged on it, and he said that he -- the way he described it is that given her behavior and her overall interactions with the kids and what she's doing in court and the pain that it's causing the family, that the kids -- that basically she deserved for the kids to be hurt and upset, and when kids are hurt and upset then they act like this.
> So indirectly, yes, she deserved it. So he wouldn't say they should have specifically poured milk on her belongings, but he thinks she did deserve for them to be acting out against her out of hurt and pain for her way of managing the divorce.
> Q. Dr. Spirko, did you and Mr. Woodward have any discussion about the importance of following Court orders or discussion about the Court orders in this case?
> A. Yeah. We talked about the Court orders and especially the overnights. I had asked – to Mr. Woodward's credit, I think he's real forthcoming with me, and I would say he seems to be very honest with me about his attitude regarding his willingness or lack thereof to follow the Court orders, and he typically -- especially in the beginning when I'm interviewing parents, they'll kind of say what they think I want to hear, and I think Mr. Woodward was being quite forthcoming with how he was feeling about the

whole process. So I definitely want to credit him with that. I do have some concerns that he sees the Court orders as --

Q.  Maybe advisory, not mandatory?

A.  I think he sees them as -- he used terms like irrational, laughable. When I had explained that he needs to follow Judge Robinson's orders, and if he doesn't, I have real concerns that that's not going to be favorable to him or his kids, he – his feedback was that I'm kind of being shortsighted or confused and not able to see the big picture.

His position is that his kids should have the freedom to make their own decisions and that 18 is a rather arbitrary age and that if his oldest daughter can make her own decisions, then the younger two should be able to too and the Court just should not be mandating anything of him or his children, and, therefore, he's just – he's not – that's his position is that the Court shouldn't do that, and, therefore, he's going to let his kids do what they want to do and he's not going to control them.

Dr. Spirko also testified about Father's attitude regarding the requirement that the minor children reside in the marital home pending an agreement on a parenting schedule:

A.  And so I -- he had related to me that Mom had sent a text message to him saying that she wanted Will brought home by 9:00, because Will had been staying over at his house on the weekends. She kind of felt like she didn't know what to do about it because he just wouldn't come home.

So she sent a text message to Dad saying, "I want Will home at 9:00, and if you're unable to bring him home by 9:00, I will bring him over." And then Dad said he got the text messages and he just ignored them, and then she showed up at 9:00 P.M. as she said she would to pick up Will. And I took his -- I took his reaction to Mom showing up to be a little like almost he was -- I would say a little amused by it.

And then he said that he told Will that he was fine with Will staying at his house, but Mom would have to be okay with it so that was between he and his mom, and he would have to go out and talk to his mom. So he sent Will out to talk to his mom, and Will came back and said Mom said it was okay for him to stay over there, so it's fine. And he had said if Mom had forced him to come home, then I would have forced him to come home.

The feedback I gave to Dad was that Mom had clearly indicated that she wanted him home, that's what the Court order says, and he ignored it, and he's putting the child in the middle of it. And so Mom is put in the position where -- the kids are aligned with Dad, and Mom is choosing, as she should I believe for the kid's best interests, not to include the kids in the middle of it.

Dad needs to be the one upholding that Court order. It can't be put on the child to be upholding the Court order. The child shouldn't be responding

to Court orders; the child should be responding to parental instruction and the parents should be acting according to the Court order.

And the piece of that that I'm concerned about is Dad saying, well, he's told the children that he's going to be doing everything he can to try to fight the Court to just give the kids freedom to do whatever they want.

And the feedback I gave was that that's an unrealistic expectation . . . .

Father's attorney advised the court that Father wished to address the court. Father testified, in part, as follows:

I just want to make very clear that never, ever have I said that I am going to battle the Court, fight the Court, disobey the Court's orders. I believe in the rule of law. I have my entire life. You are the rule of law. You set the law, and I follow it unequivocally.

So what was stated that I said I'm going to fight the Court is absolutely one hundred percent false. What I said was that in a custody battle for my children, I was going to fight for them. That's what I said, and under Bible, whatever, that's a fact.

After hearing all of the evidence, the court awarded sole temporary custody of the two minor children to Mother and prohibited Father from contacting the children or attending their school activities. In an order entered on October 18, 2021, the court memorialized its custody decision. The court found that Father "has engaged in a pattern of emotional abuse of the Wife by his behavior in allowing the children to berate her and by involving the children in this conflict." The court further found that "Husband wants what is best for his children, but the Court is very concerned that Husband's view of what is best for the children is currently distorted" and that Father had encouraged abusive behavior by the children toward their mother. The order includes the following provision:

ORDERED, ADJUDGED AND DECREED that Husband shall be <u>enjoined</u> and <u>restrained</u> from having any direct or indirect contact or access to the children as of 12:30 p.m. on September 24, 2021. Husband shall not attempt to contact or have any interaction with the children in any manner whatsoever, directly or indirectly, as of 12:30 p.m. on September 24, 2021, pending further orders of the Court. As of said date and time, he shall not text, call or email the children, have others contact the minor children for him, come about the children, nor allow the children to interact with him. . . . Husband shall not go to the children's schools to participate in any school activities. Husband shall not come onto the property of the marital residence, nor shall he pull into the driveway of the marital residence, walk on the property, or come into the house for any reason.

- 7 -

(Emphasis in original). The court ordered that Father attend "individual counseling to help him correct his view of what is appropriate for these children with regard to their behavior toward Wife as respectful children."

## Agreed order regarding parenting time

On October 29, 2021, Father filed a motion for review of the court's October 18, 2021 order, seeking parenting time with the children. On November 10, 2021, the court entered an agreed order of the parties reinstating some parenting time for Father. The new order provided, in part, that Father could attend "the children's sporting events, school functions, or extracurricular activities" provided that "he shall not sequester the child(ren) or spend any alone time with them, but shall merely attend and talk to them in public as other parents do." Father was also permitted to send text messages to the children and was to send Dr. Spirko copies of the text messages. Father was not to have telephone contact with the children except under the supervision of Dr. Spirko or Dr. Woodman, or Mother. Father was permitted to exercise five hours of unsupervised parenting time with the children during the Thanksgiving holiday 2021.

## Father's motion to reinstate parenting time

On December 3, 2021, Father filed a motion to reinstate parenting time, which was heard on December 17, 2021. Dr. Spirko had not yet completed her report. Counsel for Father made a statement criticizing Dr. Spirko for acting inappropriately in her role as forensic evaluator. The court responded:

> I want everybody to remember that the Court heard testimony from these parties early on in this matter. And I was kind of horrified, frankly, with some of your client's behavior in this, Counsel.
> Now, I can't imagine anything better for her [Dr. Spirko] to do than to try to be helping these parties learn to coparent with one another. It seems to me that's why we have experts, in an effort –

There followed a discussion between Father's counsel and the court regarding Dr. Spirko's role and actions. Father's counsel asserted that "it has been 84 days since my client has had any meaningful parenting time with these children" and that Father was "not sitting here doing meth" or "physically abusing these children." The court responded:

> Let me stop you right there. I heard what he was doing. I heard the testimony. He had to try to keep his own children -- as a result, in my opinion, of his behavior of inserting these children in the middle of this divorce case, keep his own children from assaulting their mother as she was trying to leave. So that's what he's done.

And, in a lot of ways, that's worse than using drugs. Because that sort of behavior has -- as far as I'm concerned, it's changed the landscape of this divorce case. This is not a case where the children have been insulated from this divorce. They've been thrown right into the middle of it. And as far as the Court's concerned, from what I've heard in this courtroom from the witnesses in this courtroom, he is the person primarily responsible for that.

The court declined to consider Father's motion until Dr. Spirko had completed her report. In response to Father's concerns, the court ordered no further communication between Dr. Spirko and Dr. Woodman regarding the case and directed Dr. Spirko not to provide "instructions or therapy to either party or participate in any type of effort to help them with their coparenting going forward."

## Forensic report

Dr. Spirko completed her forensic psychological evaluation and submitted it to the court, under seal, on January 20, 2022. We will outline the contents of Dr. Spirko's report only to the extent necessary to address the issues raised by Father. Father's arguments emphasize Dr. Spirko's reliance upon an incident that occurred on December 19, 2021, after one of William's basketball games. After the game, Father asked William to come to his vehicle to obtain Father's Christmas gifts; then, Father, William, and Sarah sat in the vehicle for approximately ten minutes. In her report, Dr. Spirko included a detailed description of the incident and attributed quoted statements to Father and William. According to Dr. Spirko's report, when Mother asked that William get out of the vehicle, Father and William reacted with anger and hostility toward her.

As part of her evaluation, Dr. Spirko administered the Baker Alienation Questionnaire, a tool used to assess the potential presence of parental alienation, to William and Geoffrey. Father focuses upon statements made by the children in the course of the assessment indicating that they considered Mother to be a good mother and wanted to have a 50/50 parenting schedule. Both children acknowledged feeling angry toward their mother for her perceived role in causing the divorce. The older son was also angry because of Mother's opposition to his attending boarding school.

In her findings, Dr. Spirko concluded that Mother appeared "psychologically fit to serve as a primary custodian" and that Father's complaints concerning her mental health and fitness as a parent appeared to be "completely unfounded." As to Father, Dr. Spirko found that he had interacted with Mother "in a consistent pattern of behavior characteristic of coercive controlling violence" that was harmful to Mother and the children. Further, Dr. Spirko concluded that Father was "engaging in parental alienation tactics that have caused the parties' minor children to be aligned with Mr. Woodward and against Ms. Woodward." Dr. Spirko noted that both minor children were "showing significantly concerning behaviors of aggression and coercive control towards their mother

- 9 -

characteristic of proxy abuse." In Dr. Spirko's opinion, the "primary concerns to the children and parenting in this family system stem from the risks of the children's continued exposure to and involvement in Mr. Woodward's pattern of abusive control of Ms. Woodward." She did not find a substantial threat of physical trauma on Father's part, but considered the danger of physical trauma by the minor children to be "a serious concern."

Dr. Spirko made recommendations, including that the children be placed in Mother's sole custody with no contact with Father for at least 90 days. During the 90-day period, the children and Mother should participate in family reunification therapy and Father should participate in individual psychotherapy. Dr. Spirko recommended that Father complete a domestic violence intervention program and that the children's contact with Father be restored only after he met a list of conditions, including a progress report from Father's treating therapist. Dr. Spirko made treatment recommendations for the two minor children. If either of the minor children refused to participate in the prescribed treatment or failed "to show meaningful improvements in their behaviors toward their mother," Dr. Spirko stated that a "higher level of care may be warranted." Dr. Spirko recommended a residential wilderness-based treatment program as one option to consider by Mother should the children require a higher level of care.

### Mother's motion to implement Dr. Spirko's recommendations

Mother filed a motion to implement Dr. Spirko's recommendations, and the matter was initially set for hearing on February 18, 2022. Father's motion to reinstate parenting time was also set for hearing that day, and Father's counsel struck that motion. Father's counsel requested a continuance on Mother's motion regarding Dr. Spirko's recommendations. The basis for the continuance was Father's pending motion (set for later hearing) to authorize his expert witness, Dr. William Kenner, to interview the children, have access to Dr. Spirko's report, and review the audio recordings referenced in the report. Responding to Father's motion for continuance, counsel for Mother explained that Mother had agreed to the November 10, 2021 agreed order based upon Dr. Spirko's advice that Father needed an opportunity to follow through on his statements of intention to modify his conduct. Counsel for Mother then argued that, since the agreed order had been in place, Father had violated the conditions of the order—for example, by sequestering the children at sporting events.

The court made comments from the bench after hearing the arguments of counsel. The comments cited by Father are italicized in the following excerpt:

> But I think dads are very important, and I will tell you, sir, you will have no greater advocate than this Court in regards to your participation with your kids. You have important life experiences that you need to be able to share with your children. I know that. But what I have seen – and all I know about this case is what I've heard in this courtroom. *But what I've seen, Mr.*

- 10 -

*Woodward, is you have a distorted view of what's appropriate.* Because [Mother] wants a divorce doesn't mean she is a terrible person. It's just possible that maybe you have made some mistakes. Maybe both of you have made some mistakes.

But from what I've seen, I'm very concerned that you understand what role you've been playing. And from what I've seen, it does not appear to be a role that's beneficial to your children. I know you love your kids, but, having said that, I want you to understand something. I'm reinstating what this Court thought was appropriate to do which is to cut off and preclude any contact you have with your children at this time, and that's going to stay in effect until we get Dr. Kenner's report and we have a hearing on this. And then I'll determine what, if anything, we need to do.

I don't know if you have violated the current agreed order. Ms. Rogers argues and says you have. Your attorney points out, no, that's not the case. The truth is I don't accept what attorneys say from the podium as evidence in a case. The evidence comes right here from the witness stand or stipulations or sworn affidavits or testimony of the parties or other experts.

But, Ms. Thomas [Father's counsel], you need to have a conversation with him. From 2:13 P.M., the 18th of February 2022, if he has any contact with these two children and they prove it beyond a reasonable doubt that he has willfully violated my order, I'm going to put you in jail. *I'm absolutely guaranteeing that if you have willfully violated my order and I find it beyond a reasonable doubt, I'm looking you in the eye and I'm telling you right now I'm going to put you in jail. Don't do any* ["]*I didn't understand, I didn't realize this was what was going to happen,*["] *because I'm telling you right now.*

*So I'm talking about text messages, birthday cards, contact through your older daughter, sending messages to the children, carrying letters or correspondence, emails, things on FaceTime, social media, smoke signals, anything, and I am going to put you in jail.* You need to tell me right now that you understand. So right now do you understand? That's a yes or no question.

Father stated to the court that he understood the court's directive. The court granted Father's motion for a continuance with conditions.

In its order entered on March 24, 2022, the court provided that the motion hearing was continued "on the condition that Dr. Kenner will only be able to work from Dr. Spirko's report and materials." Further, Mother's expert witness, Dr. Bradley Freeman, was limited to the same information. The court's order detailed the limitations placed upon the parties' experts, including the condition that "neither the parties nor the parties' children shall be forced to undergo further reexamination or interviews." The experts'

- 11 -

reports were to be limited to "the bounds of Dr. Spirko's Rule 35 report and the material Dr. Spirko used to compile her report." The court further ordered:

> [B]ased on the information the Court has received from Dr. Spirko's testimony in this case and from Dr. Spirko's report, the Court finds that Father represents a threat of harm to the children and thus, the Court is reinstating its previous October 18, 2021 no contact order . . . .

The Court also enjoined Father from contacting the two minor children through Sarah.

On April 20, 2022, Mother filed an amended petition for criminal contempt[4] setting forth 47 counts of criminal contempt against Father. By order entered on April 21, 2022, the court granted Father's request to appoint a guardian ad litem ("GAL") for the minor children. The court appointed Brenton Lankford.

On May 11, 2022, the parties appeared before the court on Mother's motion to implement Dr. Spirko's recommendations. The court heard testimony from Dr. Spirko regarding her report. Dr. Spirko's report included descriptions of multiple incidents involving Father and the children, many of which were documented by audio recordings, and both attorneys questioned Dr. Spirko about these incidents. Dr. Spirko was specifically questioned about the incident that occurred on December 19, 2021, summarized above, and she stated that Father "sequestered [William and Sarah] in his truck and was aggressively instructing Mother to stay out of the truck so that he could have a private – so that he could do a Christmas thing with them in the truck without Mother present."

In her testimony, Dr. Spirko referenced an audio recording of the December 19, 2021 incident as well as a later confirming conversation with William concerning what had occurred. When questioned by the court concerning how she knew that Father was not following the court's order, Dr. Spirko stated:

> I received an audio recording of him instructing the kids to be in the vehicle with him and not letting the mother in the vehicle. And then I spoke with Will and confirmed that that happened and he had the viewpoint that it was Mom's fault for being annoying. And then I saw the gifts that were given to the kids from Mr. Woodward – pictures of those, from the interaction – and then I observed – I heard audio recordings of Mr. Woodward instructing Will to stay for extended periods of time after the game and talk about college or whatever and making statements like, "This is the only time I have to parent the children. I'm going to do it." Yelling at the mother, "Don't you sit there. Don't you sit there." Not letting her in the

---

[4] The record on appeal does not contain an original petition for criminal contempt.

vehicle when he is instructing the children to be able to have a private conversation with them.

And so from the audio recordings, there are multiple incidents of him actively defying what was set up in that court order in terms of him not sequestering the children, not keeping them after the game for extended periods of time. In one of the recordings, I think it's mentioned the lights are turned off already and they are standing there in the dark.

On cross-examination, Father's counsel questioned Dr. Spirko about the December 19, 2021 incident and the nonverbal and parverbal cues cited by Dr. Spirko. On appeal, Father quotes extensively from this line of questioning of Dr. Spirko and emphasizes that Dr. Spirko testified that Father was yelling at Mother; further, Father identified five times when Dr. Spirko referenced a recording of the incident. When questioned by the guardian ad litem, Dr. Spirko acknowledged that being further separated from his father would likely cause William to become angrier. Dr. Spirko stated:

In general, I think this is not good for him, and he should have both parents in his life. So, yeah, I think that the time without either parent may be damaging.

Dr. Spirko supported working to repair William's relationship with his mother and to reestablish contact between William and his father as quickly as possible. She expressed concern that, at present, Father would "in a covert manner, interfer[e] with the therapeutic process and influenc[e] Will in a manner that is opposite from what is in his best interest."

At the May 11, 2022 hearing, Mother moved to exclude the testimony of Dr. Kenner based upon his alleged failure to work within the limitations stated in the court's order, and the court took the motion under advisement. The hearing did not conclude, and it was set to continue on May 31, 2022. In its order entered on June 2, 2022, the court ordered that Father would be allowed three hours of supervised visitation per week with William and set out specific parameters for the supervised visits.

The hearing continued on May 31, 2022. The court heard the remainder of Dr. Spirko's testimony followed by Mother's testimony. On appeal, Father emphasizes Mother's testimony concerning her closeness with William and the activities they enjoyed doing together. She acknowledged William's stated preference that he have equal time with both parents. Mother also described incidents where William was disrespectful. The guardian ad litem had suggested that Father be granted four supervised visits.[5] When questioned about this advice, Mother testified:

---

[5] The record on appeal does not include any pleadings filed by the guardian ad litem.

- 13 -

Q. Now, would you -- are you opposed across the board to him ever seeing his father or seeing his father unsupervised?

A. No. That's my goal, and the end of all of this is hopefully that he can see both of us and one doesn't preclude a child from wanting to be with the other one and that's where it's gotten off track.

Q. Why do you oppose the guardian ad litem's suggestion that after four . . . supervised visits we should go to unsupervised time?

A. I'm worried about that just being laid out there with the history of everything that's gone on. I think it's kind of -- be easier -- I thought about it and I feel like -- and Mr. Lankford [the guardian ad litem] said why don't we just try to appease [Father] and give him what he wants and then maybe he'll start, you know, behaving better and won't do this stuff that [Father] has been saying to the kids.

. . . .

[A]nd, yes, one way to deal is just to give in and please the – please the beast I guess is the only way to say it. And then everybody – that's kind of how we functioned. So that just brought back all of these memories of why I'm even here in the first place.

It's much easier to just please him and then hope that he will change, but what has happened is I've tried that lots and lots of times. That's my goal. That's still my goal. I hope that -- I hope for that to happen, but that it just gets worse every time. And every time anybody has contact with him, it's horrendous and what I see going on with my children just being torn back and forth.

Later, Wife reiterated: "If it does not affect my relationship with the children, I am in favor of a 50/50 contact with Dad if it does not preclude them from having a relationship with me."

Mother's attorney called Dr. Woodman as a fact witness. He testified that he had begun seeing William for counseling prior to September 2021, when the court suspended any attempt at family counseling but allowed Dr. Woodman to continue providing individual counseling for William. Pursuant to a November 2021 order, Dr. Woodman was to begin providing individual counseling for Father. Dr. Woodman testified that he met with Father a total of eleven times. He stated that Father was cooperative initially and that he observed an improvement in William's level of cooperation during that time. In early December 2021, Father became less cooperative, and Dr. Woodman was advised by the parties' attorneys that Father "did not need to attend therapy any longer." Father stopped making appointments to see Dr. Woodman; however, Dr. Woodman continued to see William. Dr. Woodman testified that he subsequently received a letter from an attorney

for Father containing a threat that Father would sue him. Father accused Dr. Woodman of violating confidentiality.[6]

Mother called her expert witness, Dr. Freeman, who gave his opinion regarding Dr. Spirko's report.[7] Dr. Freeman agreed with the majority of Dr. Spirko's report, including the finding of narcissistic traits in Father. Dr. Freeman agreed with Dr. Spirko's analysis concerning parental alienation and opined that there was sufficient data to support her conclusion that there was parental alienation by Father. Dr. Freeman had reservations about Dr. Spirko's recommendation that Mother and William attend an intensive reunification program. He agreed that a 90-day no contact requirement and parental reunification treatment were recommended in severe cases of parental alienation and stated that he would not recommend those measures in the present case.

The court posed a hypothetical question to Dr. Freeman, and the following exchange occurred:

> THE COURT: If one or both parents – and I don't know the facts of this. This is a strange case in that a lot of information is coming in through Dr. Spirko's reports and Dr. Kenner's reports that may well come into evidence at the divorce trial, and I may find that everything that's reported as [sic] accurate or I may find that it's not. So I don't really know exactly what's occurred. I have kind of an outline of what may have occurred, but, again, without hearing the parties testify, it's difficult for the Court to just accept this.
> But if one or both of the parents don't want therapy to work, one or both of the parents is interested in punishing the other parent – arguably if the father is so offended by the wife wanting a divorce that he is – if his position is I want to punish her and I want her to be punished for a long time, like years, damaging her relationship, will any of this therapy work?
> THE WITNESS: I would say that it is overwhelmingly unlikely to work.
> THE COURT: . . . I mean, my concern is we've got – what? – two years of work with young Will, and we're not through the divorce. We've got still a lot of painful stuff to deal with. So the concern that [the] Court has is these parties can spend a lot of emotional capital and a lot of financial capital in working on these things that may not be -- may not realistically work, and it's only after the children become their own persons and maybe

---

[6] Dr. Woodman testified that he did not believe he had violated confidentiality in speaking to Dr. Spirko because Father had given him permission to contact her, and Dr. Spirko confirmed she had written permission to speak to Dr. Woodman. Father later withdrew his consent, at which point Dr. Woodman sought clarification from the attorneys.

[7] Dr. Freeman's report is not included in the record on appeal.

- 15 -

start realizing, you know, I'm looking at this a different way because now I'm an adult and I have relationships and I understand the problems here, that they can check their own temperature and decide whether they need to take a different course. Does any of that make sense?

THE WITNESS: Oh, yeah, it all makes a lot of sense.

THE COURT: So my concern is can we really do anything in two years, especially if this today was the last day of the divorce case and now we're going to set up something? Maybe in two years something can occur, but we're still probably a year away from these parties being divorced.

Dr. Freeman recommended Dr. Emily Moon to provide reunification therapy locally.

On cross-examination, Dr. Freeman was questioned about Dr. Spirko's "interim report," meaning Dr. Spirko's initial testimony that Father was damaging the children by putting them in the middle of the divorce conflict. Father asserts on appeal that Dr. Freeman characterized Dr. Spirko's action as "prejudicial." The actual testimony is as follows:

Q. Dr. Spirko formed her September 24th highly prejudicial opinion before she had formulated her differential diagnosis; isn't that correct?
A. That's true, this did come out before her report.
Q. Dr. Spirko formed her highly prejudicial September 24th opinion before she even interviewed the children; isn't that correct?
A. I'm not sure if I would qualify it as highly prejudicial, but she did form an opinion.
Q. You don't think that was highly prejudicial to my client, what she said there?
A. Well, I mean, it's definitely not putting him in a good light.
Q. Okay. What would you like to call it then if it's not highly prejudicial?
A. Prejudicial.
Q. Okay. Then we'll call it prejudicial. . . .
. . . .
Q. You would agree with me that Dr. Spirko formed her prejudicial September 24th opinion before she had collected all the data that she needed to collect? Wouldn't you agree with that?
A. Well, if she has information that the father's behaving in this way, you don't necessarily need every last bit of data to form an opinion of this type. I mean, if there's obvious information that the father is putting the kids into this kind of situation, then forming that type of opinion early on is reasonable because it is harmful to the children and it does need to be corrected sooner rather than later.

The GAL questioned Dr. Freeman regarding the GAL's response to Mother's motion to implement Dr. Spirko's recommendations.[8]  Dr. Freeman testified that he favored "a more gradual reunification with the father," but felt that the GAL's recommendations were "acceptable."  Dr. Freeman stated that "this success really depends on the father and the father's support of the children having a relationship with Mom."

In response to Mother's motion to exclude Dr. Kenner's testimony, the court found that Dr. Kenner "strayed outside the areas" established by the court.  Nevertheless, the court decided to admit Dr. Kenner's report and testimony and to consider his failure to follow the court's limitations in determining the weight to give Dr. Kenner's opinion.  Dr. Freeman testified regarding Dr. Kenner's report, which he considered unbalanced because it contained only positive statements about Father and few positive statements about Mother.

At the end of the hearing, after hearing the testimony of several experts, the court again admonished Father:

> But I am -- I want Mr. Woodward to please understand that I can't allow him to have conversations with his son regarding this case. Always this Court tries to insulate and isolate children from divorce cases. It's impossible to do, especially the older they are the more they understand. But it's not in his best interests, nor in my opinion is it in Will's best interests for him to have conversations with your son about what's going on in the divorce case. So I will tell you that if I get evidence that an effort is being made to do that, I'll react swiftly and it will be painful. So I hope that you will understand and hear what I'm trying to tell you. I want you to see this child.

The hearing on Mother's motion to implement Dr. Spirko's recommendations continued for a third day on July 11, 2022.  The GAL advised the court and the attorneys that the management team of the GAL's law firm had received a memorandum from Father the previous day.  In this memorandum, Father "outlined [the GAL's] malpractice and ongoing negligence in this case."  As a result, the GAL felt that it was no longer appropriate for him to act as the GAL and requested the court's permission to withdraw as the GAL.

At the hearing, the court learned that the GAL had filed an amended response to Mother's motion after the previous hearing and prior to Father's communication with the GAL's firm.  (Father's counsel assured the court that he had not prepared the memorandum.)  The GAL and Dr. Freeman had both changed their initial recommendations, and Dr. Moon agreed with their modified recommendations.  In his

---

[8] The GAL's response is not part of the record on appeal.  Based upon Dr. Freeman's testimony, it appears that the GAL's plan was to work toward a 50/50 arrangement as of July 3, 2022.

amended pleading, the GAL notified the court that William "urges the guardian ad litem to take a position that the guardian ad litem believes is contrary to the child's best interests."

Father's expert, Dr. William Kenner, testified about his analysis of Dr. Spirko's report. As referenced above, Dr. Kenner went beyond the parameters established by the court: he conducted interviews with Sarah and Father and reviewed materials that were not part of Dr. Spirko's evaluation. The court allowed Dr. Kenner to testify but advised that the court would consider Dr. Kenner's noncompliance in evaluating the weight to be given his opinion. Dr. Kenner criticized Mother, whom he accused of lying, and cited her "failure to recognize the pain that she caused [William]." He characterized Mother as having "created a false narrative as a victim," and he characterized Father as having "buffered [William] from Mother's emotional volatility" prior to the divorce.

Dr. Kenner testified that there are three basic stages in a divorce—the impact stage, the re-call stage, and the reorganization stage. According to Dr. Kenner, a parent in the impact stage feels "shock" and is "disorganized and in the grip of uncontrolled guilt, anger, self-pity, and sadness." When the court questioned counsel for Father concerning the relevance of this testimony, counsel argued that Father's conduct on the tape played at the first hearing (regarding the marital residence) "was around the time this man [Father] is going through this impact stage and was probably not quite in his right mind." The court then made the following statement:

> Well, I'll be real honest, I'm not going to accept everybody is crazy and so behavior is justified. Everybody is not crazy. These are responsible adults, and even when you have problems, including problems in your marriage, you still have to act and behave appropriately. And so the tape I heard was the children and the mother and with the father standing there. So it seems to me that he [Father] had a duty to step up and prevent the children--what the children did and how they behaved, at least to do the best he could to prevent it. But I don't know that going over the husband and the father's reactions to divorce at this time is going to help us very much.

This first paragraph of the court's statement is the only part of the July 11, 2022 hearing addressed by Father on appeal.

Dr. Kenner disagreed with Dr. Spirko's opinion that Father was guilty of parental alienation. He opined that the two sons had "experienced attachment trauma from their separation from Mr. Woodward, their father and best friend." Dr. Kenner's recommendation was that the court permit him to interview the two sons in order to gain information that Dr. Spirko "potentially missed" in her evaluation. He suggested that the two parents receive counseling with Dr. Moon to encourage William to participate in therapy.

Next, the court heard further testimony from Dr. Freeman, who confirmed that he had changed his opinion since the previous hearing. Dr. Freeman's current recommendation was to follow Dr. Spirko's report—for Mother and William to attend intensive family reunification and for a 90-day restriction on contact with Father. Counsel for Mother questioned Dr. Freeman about text messages between William and his siblings showing that they had been working together to circumvent the court's limitations on his contact with Father (i.e. supervised contact only). Father and Will were both refusing to participate in therapy. Dr. Freeman opined that William was being manipulated by Father and his older siblings. He testified that William had become more oppositional with Mother.

Counsel for Father called Father to allow him to "tell[ ] the Court whatever it is you want to tell the Court today." Father expressed his disapproval of the court's decision to eliminate or restrict his contact with William and the proposal to send William to "this crazy camp."

### Father's motion to strike GAL's amended response

Father filed a motion to strike the GAL's amended response, arguing that the response did not comply with Tennessee Supreme Court Rule 40A. The motion was heard on August 5, 2022. The attorneys presented arguments on Rule 40A and the applicable committee comments to the rule. The court denied Father's motion to strike the GAL's amended report.

In an order entered on August 31, 2022, the court memorialized its decision. In his appeal, Father cites the italicized findings from the court's order:

1. *This is a unique case. It appears to the Court that Husband was undermining or attempting to undermine the Court's Guardian Ad Litem by threatening his superiors with allegations of misconduct on behalf of the Guardian Ad Litem such that the Guardian Ad Litem withdrew from the case, and made it impossible for the Court to appoint any other Guardian Ad Litem, because no other attorney would take the case under those type of circumstances.*
2. It was clear to the Court from the evidence introduced at a prior hearing that the minor child was conspiring with an adult sibling to be able to communicate with the Father when the Father was under an order not to communicate with the minor child. The Court does not believe it is required to ignore that, and does not believe that the Guardian Ad Litem did, either.
3. *The Court does not believe that it is bound by the interpretation of the law set forth in the Committee Comments to Tennessee Supreme Court Rule 40A. The Court still believes that being a Guardian Ad Litem means*

- 19 -

*something, and that does not mean that the Guardian Ad Litem has to parrot everything a child insists upon.*

4.  Mr. Lankford is a talented and very capable attorney, and from everything the Court observed about his behavior in this case, he took his position as Guardian Ad Litem seriously and he was supporting the position advocated by the minor child until it appeared that the minor child was attempting to circumvent the Court's orders with the assistance of an adult sibling and, from the emails introduced at a prior hearing, the assistance of the Father.

5.  The Court believes that the Guardian Ad Litem is required to present what they think is in the best interest of the child when the Guardian Ad Litem's opinion differs from the minor child they are representing. Based on the time Mr. Lankford put in, the Court does not question that he performed all of his duties and the Court does not believe that the Guardian Ad Litem has to parrot a child's desires if he knowingly, based on his investigation of the case, believes that it is not in that child's best interest.

6.  *The Court is conflicted about this issue. If the Committee Comments to Rule 40A(9) are the interpretation to be placed on that Rule, what are we left with with a Guardian Ad Litem? Husband's reading of the Comments are exactly what they said. On the other hand, the Court knows Mr. Lankford and the hours he put into this case based on his billing and in his arguments he would quote things out of the various reports from psychologists that was very impressive to the Court. It is hard for the Court to believe that he did not also look at the Rule and Committee Comments, and the Court does not think that he would have taken the position he did in this case without feeling that he was in strict compliance with Rule 40.*

Court's comments at motion hearing

On August 19, 2022, the court held a hearing on several motions regarding discovery and other matters. Father had filed a motion to require Mother to "release" his phone number and the phone numbers for the two adult children from her phone plan. Mother agreed to release the adult children's numbers but did not want to release Father's phone number. Counsel for Mother argued that the court should preserve the status quo during the divorce and that it was important for Mother to retain the ability to monitor Father's alleged violation of court orders. On appeal, Father objects to the italicized portion of the following statements made by the court:

THE COURT: *Well, but what [Mother is] saying is [Father] is violating the Court's orders.*

- 20 -

MR. HAYES [Counsel for Father]: Well, if you're going to accept hearsay. I mean, I've never seen that before. I don't know where it came from. I don't know what app they used. I don't know what that is other than a bunch of pictures, but, Judge, what does that have to do with the price of tea in China? I mean, if he wants to violate Court orders, he can get another phone. He just wants his number. That number is his phone number, and to save him the expense because he doesn't want to be tracked by her anymore, I mean, I'll advise him to just go get a whole new phone number on a whole new plan. That doesn't violate any court orders.

THE COURT: Why doesn't he do that?

MR. HAYES: Because he wants that number, Judge. I mean, why does he have to get a new number? Why is she holding onto this phone number? The only reason --

THE COURT: But I know that Mr. Woodward is a smart person. He's known since the divorce started that she had access to all of that information. I mean, he's not stupid. I know he's a smart guy. So he's known it. If he really needs this privacy, then he could have just bought him a new phone and got on another plan and gone on, and after six months he wouldn't need that number anymore because everybody that he wants to will already have it.

MR. HAYES: Judge, why can't he have that number? Why does she need that number is the question you should be asking?

THE COURT: I know she wants to continue to monitor his access to this child.

. . . .

THE COURT: . . . Here is the situation, folks. The truth of the matter is that there are probably plenty of contempt petitions to go around. As far as I'm concerned, these parties do need to cut the umbilical cord. I'm going to order that the mother give Mr. Woodward his phone number and the children's numbers. And they can -- . . .

I'm talking about the adult children. And Will's number will stay with her, and I'm sure he'll end up with another cell phone somewhere.

The court granted Father's motion.

Final hearing and order on Mother's motion to implement Dr. Spirko's recommendations

The hearing on Mother's motion to implement Dr. Spirko's recommendations continued on April 29, 2022. The court heard testimony from Dr. Jane Mercer, an expert for Father who raised questions regarding the validity of the parental alienation theory upon which Dr. Spirko relied in her report. The next witness for Father was William, who was 16 years old. At the end of William's testimony, the court made some comments to

William regarding the divorce process.  On appeal, Father cites the italicized portion of the following statements made by the court:

> I will tell you that people who have a lot of assets, their divorces always take a long time. And it's because they have to get these experts and go around and value real estate and things like that. I would agree with you that most divorces, in fact many of them, can be resolved in three or four months and it's over with and people can try to go back to trying to be normal again.
>
> *But your parents own a lot of property, and we've also been struggling with this parent issue here.  But none of that, as far as the Court is concerned, is your mother's fault, other than the fact that she wanted a divorce.*

(Emphasis added).

Dr. Spirko then testified in response to Dr. Mercer's testimony.  Moreover, the court heard brief testimony from Mother and Father.  After all of the testimony had been given, the court made some general comments to the parties.  Father cites the italicized portions of the following statements made by the court:

> *One thing I agree with Mr. Woodward on is that what has occurred in this case is a tragedy. It's one that the Court is responsible for, sadly, because of the Court's concerns of Mr. Woodward's behavior. And, frankly, I believe Mr. Woodward has done everything he can to not obey Court orders.* And Ms. Woodward testified that she came to the house after the milk and orange juice behavior -- and I don't believe the police ordered that these children spend two weeks with their father. I believe the police may have asked that the mother let them go with their dad to try to deescalate the situation, but the children didn't come back even though this Court put them in the possession of the mother.
>
> Mr. Woodward didn't order them to leave -- order the children to return to their mother's home, even when she went to try to get the children. He has done everything he can to undermine the guardian ad litem in this case. So the Court thinks that *Mr. Woodward bears a considerable amount of responsibility for us being where we are.*
>
> Having said that, I recognize that no children want their parents to get a divorce. Almost every child I've got in every case would rather their parents be back together and be courteous and polite and sweet and loving to one another because that makes a child feel secure, but we know that that can't happen in most of these cases, and so we do the best we can.
>
> I have a concern. I think Dr. Spirko's evaluation is thorough and well done. I think we've gotten the opinion of Dr. Freeman on it, and while he has

some minor criticisms, I think he agrees in the treatment that Dr. Spirko has suggested.

We did hear from Dr. Kenner. Unfortunately, Dr. Kenner did not do what the Court asked him to do, but I will say that Dr. Kenner has had many years of experience, and generally his testimony is worth listening to even though the Court may disagree with his conclusions. But he is an experienced man, and he has had a lot of experience in these matters. I would rather have too much information than not enough.

. . . .

The Court is faced with this situation. This young man is 16 years of age. I'm not going to put handcuffs on him. I think that would be self-defeating. I think if I hold him in contempt of court and send him down to juvenile court – detention down there, that would be self-defeating to his relationship with his mother.

*We will see what we will see when we have the contempt petitions against Mr. Woodward. The only solution this Court generally has in violating my orders is incarceration. I have to look at it on a case-by-case basis, and I will do that in this case.*

. . .

Dr. Spirko, I think, is correct that where children see one parent getting away with behavior, they don't have much respect for the Court's orders either.

(Emphasis added).

The court took Mother's motion to implement Dr. Spirko's recommendations under advisement. In the meantime, the court put down a temporary parenting plan giving Mother and Father equal parenting time with William. The court advised William of the importance of acting in accordance with the court's orders, and William voiced understanding. The court entered its order on October 5, 2022. On appeal, Father objects to the court's use of the same language identified above from its oral ruling.

<u>Mother's motion to set aside the temporary parenting plan and implement Dr. Spirko's recommendations</u>

The parties were back before the court on November 29, 2022, on Mother's motion to set aside the temporary parenting plan and to implement Dr. Spirko's recommendations. The court heard testimony from Mother and a friend of Mother's. Mother presented evidence to show that Father had violated the court's orders regarding parenting time. The evidence included two audio recordings of conversations between Mother and William, which the court admitted over Father's objections. The court issued a restraining order enjoining Father from taking three dogs from the marital residence or from Mother's possession pending the final property division. Dr. Spirko also testified further concerning her recommendations.

- 23 -

Father then put on proof in the form of testimony from Father and William. In response to a comment from William, the court made the following statements:

> Watch your mouth with me, because I don't have to put up with it. I understand [Father] has to work. What he can do is pick up the phone and can call your mom and say is it okay if Will spends the night with you the next couple of nights, to which she would almost certainly say of course. But she doesn't get that courtesy. What she gets is you pulling in the driveway saying your dad's out of town. *That's not how adults treat one another. Your dad is part of the problem here.*

(Emphasis added). In his appellate argument, Father cites only the italicized portion. The court clarified the directives from its previous order and cautioned Father and William that this was the last chance for them to make the 50/50 parenting schedule work.

At a hearing on January 13, 2023, and pursuant to an order entered on February 6, 2023, the court granted Father's motion to lift the discovery stay with respect to materials to be used as evidence at the continued hearing on Mother's pending motion to implement Dr. Spirko's recommendations. Father cites the italicized portion of the following statement by the court concerning Father's motion to allow William to apply to a boarding school:

> It also . . . seems to me to be a convenient means of getting these two children, the older child and now this child, out of the mother's home and somewhere where she can't have day-to-day contact with them. *The Court is not blind to what Mr. Woodward is doing, as far as I'm concerned. I know nothing about him except what I have seen in this court and this is really a tragic circumstance.*

(Emphasis added). The court granted Father's motion to submit William's application.

The hearing on Mother's motion continued on February 23, 2023.[9] The Court heard testimony from both parties. Mother's testimony included accounts of continuing difficulties with William's disrespectful behavior as well as instances during Father's parenting time when William was not under the supervision of an adult. During Mother's testimony concerning the need to implement Dr. Spirko's plan, the court asked Mother: "Tell me one thing—tell me one thing that Mr. Woodward has done that has been helpful in your relationship with your son. I haven't seen it." The court also expressed doubt that the proposed intervention was going to bring about the desired changes:

---

[9] At the hearing, the court was informed that Husband had sued Dr. Spirko and Dr. Woodman.

- 24 -

I don't see how anything – [Father] going to therapy would help, because he doesn't want to do that. And if all he does is say other things to the therapist, it isn't going to change anything. Now, I can put him in jail, and that's okay. If I tell him to go somewhere, I bet he'll go. I can have him go sit down with a therapist, and I think he'll look out the window.

Father cites these statements on appeal in support of his position.

In an order entered on March 7, 2023, the court set forth its findings regarding its efforts to make a joint custody arrangement work. The court found that these efforts had not been successful and ordered that Dr. Spirko's recommendations be implemented with a few modifications. The court set out the terms of the new parenting arrangement, including the requirement that Father have no contact with William for at least ninety days. Contact between Father and William would not be restored until Father and William had "consistently maintained" the conditions described in the order.

<u>Father's emergency motion to stay the order and motion to alter or amend</u>

Thereafter, Father filed a motion seeking relief from the court's order to implement Dr. Spirko's recommendations. The court heard arguments on Father's motion on March 24, 2023. On appeal, Father objects to several of the court's statements at the hearing:

But the real issue, as far as the Court is able to determine with Mr. Woodward, appears to be a control issue. And control, I think, ranks right up there as a form of domestic violence. And this Court has seen testimony and heard testimony regarding Mr. Woodward's behavior toward the mother as they were having discussions where he would prevent her from leaving the room. So I think that is a form of domestic violence, and as far as I'm concerned the recommendations of Dr. Spirko need to be complied with. If Mr. Woodward chooses not to, then he risks a finding of willful contempt –

In response to Father's counsel's argument that the court should not include restrictions on Father's attendance at extracurricular activities, the court stated:

It does not appear to me based on Mr. Woodward's behavior -- again, all I know about of him is what I've seen in the courtroom and what I've seen as a result of his evaluation by a psychologist that he himself participated in selecting. But the Court finds that he is not inclined, in my opinion, to correctly interpret the Court's orders.
. . . .
The Court's position is because I don't feel that I can trust that Mr. Woodward would simply view -- I think he would want to use this as an opportunity to communicate with his child and he's not supposed to. So I'm

- 25 -

ordering him to stay away from any of his sporting events and any of his practices or school activities in any manner because, as far as the Court's concerned, that's a form of contact with his child.

The court also stated:

It would be kind of nice if we got Mr. Woodward's cooperation for a change because this Court is interested in both parents having a good relationship with this child and their children.

The court denied Father's motion to stay its previous order pending appeal. The court granted in part Father's motion to alter or amend to modify the provision limiting William's contact with his siblings. In its order, entered on April 17, 2023, the court made findings with language similar to that set out above. Father also objects on appeal to the court's reliance on Dr. Spirko's testimony and to the following findings in the court's order:

5. The Court finds that the Father holds great sway over all of these children. There are three children. Two of them are adults at this point, and only W.E.W. is a remaining minor child. Father clearly holds great sway over these children, and all he had to do is tell the child to be nice, courteous, and polite to your Mother as you should be . . . .

7. In this case, the Court finds that based on Dr. Spirko's evaluation, Husband has issues that need to be addressed to try to give this remaining minor child the best opportunity to have a relationship with both parents, and that is what the Court is committed to.

### Father's motion to compel

Father filed a motion to compel Mother to produce certain audio recordings and a motion to allow for the execution of a contract for William to attend a boarding school. The motions were heard on April 28, 2023. With respect to the first motion, the court ordered Mother to produce any audio tapes she made by the last business day of the month in which the tapes were made.

After hearing arguments regarding the second motion, the court made the following statements:

[H]ere is the Court's position on this. *I have sadly seen this case from the very beginning. From the very beginning, there was outrageous behavior, in my opinion, by Mr. Woodward addressing this divorce in the presence of these children and the children's – as far as what the Court – from the descriptions that were provided, verbally assaulting the mother, and then*

- 26 -

*literally when she tried to leave the home, physically assaulting her such that he had to call out "Don't push your mother." So at least he did something to try to protect her at some point.*

*But everything I have heard from these children is that their father – they respect him immensely and what he wants, and what he likes carries, I think, great weight with them. This case didn't have to be in this horrible – and I'm the first to admit it's in a terrible circumstance. I think based on what I've seen had Mr. Woodward told all his children, "Be courteous and polite to your mother. Don't tell her she is stupid. Don't act inappropriate. Treat your mother with the respect that your mother deserves," I think that would have happened, and I think we wouldn't be in this situation.*

But it appears to this Court that the effort to move Will to Woodberry is the same thing, as Ms. Rogers suggests, was going on with the older son. At that time I remember seeing it and hearing that he didn't make the MBA basketball team and he wanted to go to Woodberry where he thought he had a better chance. That's one of the most entitled things I've ever heard to go from spending 25- or $30,000 to spending maybe close to double that so he can -- so this young man can have a better chance of getting to play on the varsity basketball team.

. . . .

And all the mother -- I would not have allowed him, I don't think, to go to Woodberry, but my understanding is that the mother agreed after some delay. She didn't want to alienate her son, and she allowed him to go. And all it did was further complete his withdrawal from her company and being around her.

I have to agree with Ms. Rogers that a child doing this well, it's silly to interrupt their education. There will be a time where maybe Will can make that decision. If he decides he wants to change after he's turned 18, the Court doesn't have anything to say about it, I don't think. If I did, I wouldn't let him go.

(Emphasis added). The court denied Father's second motion. On appeal, he objects to the italicized portions of the court's ruling from the bench.

### Contempt hearing

Father also relies on evidence presented at the initial hearing on Mother's amended petition for criminal contempt, which was held on May 9, 2023. In addition to the parties' attorneys, counsel was present for Dr. Spirko, who had been asked to appear as a fact witness on Mother's behalf.

Prior to hearing testimony, the court considered several preliminary matters. Counsel for Father brought to the court's attention an issue regarding two audio recordings

requested from counsel for Mother; Mother's attorneys had then informed Father's attorneys that they did not have the recordings at issue. It appeared that, in her testimony regarding the incident on December 19, 2021, Dr. Spirko had erroneously referred to an audio recording of the incident. Father's counsel agreed to handle this issue through cross examination when Dr. Spirko testified. Father's attorneys also argued in favor of Father's motion to dismiss. The court granted Father's motion to dismiss 17 counts of the amended criminal contempt complaint and, otherwise, took the motion under advisement.

The hearing then proceeded, and the court heard testimony from Mother and from Rusty Harlow, a private investigator hired by Mother. The court then recessed, with the hearing set to continue to the following morning.[10]

<u>Father's motion to disallow Dr. Spirko to offer expert testimony</u>

On June 1, 2023, Father filed a Motion to Remove Dr. Katie Spirko's Designation as Rule 35 Expert and to Disallow her from Offering Expert Testimony. On June 28, 2023, Husband filed a Motion in Limine to Prohibit Dr. Katie Spirko from Testifying at the Hearing on Husband's Motion to Remove Her as Rule 35 Expert. These motions were heard on July 14, 2023. The court denied Father's motion in limine and proceeded to hear Dr. Spirko's testimony. Dr. Spirko testified that Mother and William both described the December 19, 2021 event to her and that she had been mistaken in referencing an audio recording of that incident. Her report contained a list of audio recordings, and there was not a listing for December 19, 2021.

As Father points out on appeal, the court expressed concern about Dr. Spirko's account of this incident:

> And I also can even understand how [Dr. Spirko] would suggest that he was yelling if she has heard other videos where he was -- had a raised voice directed toward the mother, but when we get to talking about individual incidents and she refers to him yelling and there is nothing in any of her notes about having a raised voice or yelling, that does cause me concern.
> If she's heard it in other audios, I can understand how she would adopt it when Ms. Woodward and Mr. Woodward are having conversations or in an incident where they're both unhappy with one another. But it is inaccurate when she doesn't mention that the husband said in a raised voice or the husband said in her notes that the wife says he was yelling at this point or screaming, and she adopts that, that's simply not correct.

_____

[10] We note that the record on appeal does not include transcripts of any other hearings on the criminal contempt matter.

The court struck the portion of Dr. Spirko's report concerning the December 19, 2021 incident and any testimony regarding that incident. In its order entered on August 9, 2023, the court denied Father's motion to remove Dr. Spirko as a Rule 35 expert and disallow her testimony.

<u>Father's motions for recusal</u>

On July 21, 2023, Father filed a Motion for Recusal of Trial Judge and a Motion for Recusal of Trial Judge in Contempt Proceedings, citing an appearance of bias. The court heard arguments on the motions on August 18, 2023, and stated its ruling denying Father's motions for recusal. In an order entered on August 24, 2023, the court made detailed findings of fact, which will be discussed more fully below, concluded that Father failed to meet his burden of proof on both recusal motions, and denied the motions.

Father filed an accelerated interlocutory appeal pursuant to Supreme Court Rule 10B regarding the trial court's denial of his motions to recuse.

STANDARD OF REVIEW

Under Supreme Court Rule 10B, this court must review a trial court's ruling on a motion for recusal under a de novo standard of review. TENN. SUP. CT. R. 10B, § 2.01; *Adkins v. Adkins*, No. M2021-00384-COA-T10B-CV, 2021 WL 2882491, at *4 (Tenn. Ct. App. July 9, 2021).

ANALYSIS

The Tennessee Rules of Judicial Conduct ("RJC" or "the Rules") require that judges "act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." TENN. SUP. CT. R. 10, RJC 1.2. The Rules define "impartiality" to mean acting in the "absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as maintenance of an open mind in considering issues that may come before a judge." *Id.*, Terminology. A judge is required to recuse himself or herself "in any proceeding in which the judge's impartiality might reasonably be questioned." *Id.*, RJC 2.11(A).

Our Supreme Court has recently issued an opinion setting out the principles to be applied in recusal cases: *Adams v. Dunavant*, 674 S.W.3d 871 (Tenn. 2023). The Court stated:

> Rule of Judicial Conduct 2.11 "incorporates the objective standard Tennessee judges have long used to evaluate recusal motions." *Cook* [*v. State*], 606 S.W.3d [247,] 255 [(Tenn. 2020)]. "Under this objective test,

- 29 -

recusal is required if 'a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality.'" *Id.* (quoting *Davis* [*v. Liberty Mut. Ins. Co.*], 38 S.W.3d [560,] 564-65 [(Tenn. 2001)]).

The intermediate appellate courts have explained that the proponent of a recusal motion bears the burden of establishing that recusal is appropriate and that any alleged acts of bias or prejudice arise from extrajudicial sources rather than from events or observations during the litigation of the case. *Tarver v. Tarver*, No. W2022-00343-COA-T10B-CV, 2022 WL 1115016, at *2 (Tenn. Ct. App. Apr. 14, 2022). A trial judge has a duty to serve unless the proponent establishes a factual basis warranting recusal. *Raccoon Mtn. Caverns and Campground, LLC v. Nelson*, No. E2022-00989-COA-T10B-CV, 2022 WL 3100606, at *3 (Tenn. Ct. App. Aug. 4, 2022) (quoting *Rose v. Cookeville Reg'l Med. Ctr.*, No. M2007-02368-COA-R3-CV, 2008 WL 2078056, at *2 (Tenn. Ct. App. May 14, 2008)).

Furthermore, rulings adverse to the proponent of a recusal motion are not, standing alone, grounds for recusal. [*State v.*] *Cannon*, 254 S.W.3d [287,] 308 [(Tenn. 2008)]; *Davis*, 38 S.W.3d at 564; *Duke v. Duke*, 398 S.W.3d 665, 671 (Tenn. Ct. App. 2012). "Rulings of a trial judge, even if erroneous, numerous and continuous, do not, without more, justify disqualification." *Alley v. State*, 882 S.W.2d 810, 821 (Tenn. Crim. App. 1994). "[T]he mere fact that a judge has ruled adversely to a party or witness in a prior judicial proceeding is not grounds for recusal." *Davis*, 38 S.W.3d at 565 (citing *State v. Hines*, 919 S.W.2d 573, 578 (Tenn. 1995)). The "adversarial nature of litigation" makes it necessary for trial judges to "assess the credibility of those who testify before them, whether in person or by some other means," and "the mere fact that a witness takes offense at the court's assessment of the witness cannot serve as a valid basis for a motion to recuse." *Id.* "If the rule were otherwise, recusal would be required as a matter of course since trial courts necessarily rule against parties and witnesses in every case, and litigants could manipulate the impartial[it]y issue for strategic advantage, which the courts frown upon." *Id.*

*Adams*, 674 S.W.3d at 878-79.

Before his election to the bench, the trial judge in *Adams* served as an expert witness in a 2017 case involving one of the defendants in *Adams*. *Id.* at 874. The defendants in *Adams* moved for the judge's recusal based upon his expert opinion in the previous case, and the judge denied the motion. *Id.* at 874-75. The Court of Appeals reversed the trial court's denial of the recusal motion, and the Supreme Court reversed the judgment of the

Court of Appeals. *Id.* at 877-78. The Court emphasized that, "'[r]ulings of a trial judge, even if erroneous, numerous and continuous, do not, without more, justify disqualification.'" *Id.* at 879 (quoting *Alley*, 882 S.W.2d at 821). Otherwise, "'recusal would be required as a matter of course since trial courts necessarily rule against parties and witnesses in every case, and litigants could manipulate the impartial[it]y issue for strategic advantage, which the courts frown upon.'" *Id.* at 880 (quoting *Davis*, 38 S.W.3d at 565). In the case before it, the Court concluded that the trial judge's adverse rulings "do not create an objectively reasonable basis for questioning the probate judge's partiality." *Id.*

The *Adams* decision also stated that, "the only order properly before the reviewing court [in a Rule 10B appeal] is the recusal order." *Id.* Therefore, the Court "express[ed] no opinion on the legal propriety of the probate judge's rulings" in the underlying case. *Id.* The Court held only that the adverse rulings at issue "are not sufficient to support a conclusion that 'a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality.'" *Id.* (quoting *Cook*, 606 S.W.3d at 255).

With these principles in mind, we now address the arguments raised by Father in his 10B appeal.

I.     Waiver

A.

In the trial court's opinion denying Father's motion to recuse, the trial judge deemed "any instances of alleged bias cited in Husband's Motion prior to the Court's most recent ruling from the hearing in this matter on July 14, 2023 waived." Father argues on appeal that the trial court erred in considering allegations of bias arising prior to July 14, 2023, as waived.

Tennessee law requires that, in cases challenging a judge's impartiality, "'a party must complain and seek relief immediately after the occurrence of a prejudicial event and may not silently preserve the event as an "ace in the hole" to be used in the event of an adverse decision.'" *Eldridge v. Eldridge*, 137 S.W.3d 1, 8 (Tenn. Ct. App. 2002) (quoting *Gotwald v. Gotwald*, 768 S.W.2d 689, 694 (Tenn. Ct. App. 1988)). Father asserts that he "does not offer the trial court's prior negative statements toward him over the course of the proceedings as evidence in themselves of bias" but that he offers the statements "as a foundation upon which the trial court's bias in its failure to address Dr. Spirko's false testimony must be evaluated." While the history of the proceedings is relevant, the rule remains that a party must seek relief immediately after the allegedly prejudicial event.

- 31 -

This Court has stated that, "[c]ourts frown upon the manipulation of the impartiality issue to gain procedural advantage and will not permit litigants to refrain from asserting known grounds for disqualification in order to 'experiment with the court . . . and raise the objection later when the result of the trial is unfavorable.'" *Kinard v. Kinard*, 986 S.W.2d 220, 228 (Tenn. Ct. App. 1998) (quoting *Holmes v. Eason*, 76 Tenn. (8 Lea) 754, 757 (1882)). Father argues that his motion to recuse "could not reasonably be considered calculated in its timing" because it was not made after a trial and "would not result in any strategic advantage to Husband." The parenting schedule has been the main subject of litigation between the parties in this case. On March 7, 2023, the court entered an order determining that Dr. Spirko's recommendations would be implemented. Father did not file a motion to recuse the trial judge at that point. In the trial court, Father filed a motion to stay and to alter or amend the order, a motion to compel discovery, and a motion to disqualify Dr. Spirko. Father also filed an application for an extraordinary appeal and request to stay regarding the March 7, 2023 order pursuant to Tenn. R. App. P. 10, and the application was denied by this Court and by the Supreme Court. As the trial court pointed out, "[m]any, if not all, of the Court's statements which Husband characterized as 'biased' were cited by him in support of his Rule 10 Applications to the Tennessee Court of Appeals and Tennessee Supreme Court, all of which were denied." Moreover, the trial court noted that the filing of the motions to recuse delayed the adjudication of the criminal contempt matters. Therefore, there is evidence to suggest that the timing of Father's motions to recuse was strategic.

We find no error in the trial court's determination that allegations of bias arising prior to the court's July 14, 2023 ruling have been waived.

### B.

There is a second ground for considering Father's reliance on statements from prior hearings to be waived.

In his argument regarding the legal standard applied by the trial court (which is discussed more fully below), Father cites the following statement from the court's order denying recusal: "Husband is concerned that the Court may be biased against him based on statements the Court has made at various times during the many hearings in this matter." Father argues that this statement indicates that the trial court "missed the mark with respect to its analysis of the factual basis for Husband's request for recusal." Father clarifies his asserted basis for recusal as follows:

> The basis for Husband's request for recusal is not simply the trial court's in-court statements toward Husband, which only demonstrate the pattern underlying the circumstances which indicate the appearance of bias on the part of the trial court: to wit, its failure to address Dr. Spirko's false testimony.

- 32 -

We will address Father's argument regarding Dr. Spirko below. At this point, we must note that Father identified in his lengthy recitation of the facts numerous statements made by the trial court at multiple hearings. However, in the argument section of his appellate brief, Father does not specifically address or explain his objection to the quoted statements. To the extent that Father failed to address the court's statements in his arguments on appeal in accordance with Tenn. R. App. P. 27 and Tenn. Ct. App. R. 6, we deem any arguments based upon those statements to be waived on appeal. *See City of Memphis v. Edwards by and through Edwards*, --- S.W.3d ---, No. W2022-00087-SC-R11-CV, 2023 WL 4414598, at *2 (Tenn. July 5, 2023).

II.      Incorrect legal standard applied

A.

Father asserts that the trial judge, in ruling on his motions to recuse, failed to apply the objective standard required under Tennessee law.

As stated above, Rule 1.2 of the Code of Judicial Conduct requires a judge to avoid "the appearance of impropriety," as well as actual impropriety. TENN. SUP. CT. R. 10, RJC 1.2. Father points to comment 5, which provides that, "The test for appearance of impropriety is whether conduct would create in reasonable minds a perception that the judge violated this Code or engaged in other conduct that reflects adversely on the judge's honesty, impartiality, temperament, or fitness to serve as a judge." TENN. SUP. CT. R. 10, RJC 1.2 cmt.5. The comments to RJC 2.11 (quoted above) state that "a judge is disqualified whenever the judge's impartiality might reasonably be questioned, regardless of whether any of the specific provisions of paragraphs (A)(1) through (6) apply." TENN. SUP. CT. R. 10, RJC 2.11 cmt.1.

Under the objective standard, recusal is required if "'a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality.'" *Cook*, 606 S.W.3d at 255 (quoting *Liberty Mut.*, 38 S.W.3d at 564-65). Thus, even if a judge believes that he or she can hear a case impartially, "the judge should recuse himself or herself if 'the judge's impartiality might reasonably be questioned.'" *Kinard*, 986 S.W.2d at 228.

As a general rule, to be disqualifying, a judge's bias or prejudice "must stem from an extrajudicial source and not from what the judge hears or sees during the trial." *Wilson v. Wilson*, 987 S.W.2d 555, 562 (Tenn. Ct. App. 1998). Part of a judge's role in the judicial system is "[f]orming an opinion of litigants and issues based on what is learned in the course of judicial proceedings." *Groves v. Ernst-W. Corp.*, No. M2016-01529-COA-T10B-CV, 2016 WL 5181687, at *5 (Tenn. Ct. App. Sept. 16, 2016). Therefore, "[j]udicial expressions of impatience, dissatisfaction, annoyance, and even anger towards counsel, the

parties, or the case, will not ordinarily support a finding of bias or prejudice unless they indicate partiality on the merits of the case." *Id.* Moreover, as stated above, adverse rulings, even if erroneous, do not generally justify recusal, although they might be grounds for appeal. *Id.*

In cases in which "'the bias is alleged to stem from events occur[r]ing in the course of the litigation . . ., the party seeking recusal has a greater burden to show bias that would require recusal, i.e., that the bias is so pervasive that it is sufficient to deny the litigant a fair trial.'" *Clemmons v. Nesmith*, No. M2016-01971-COA-T10B-CV, 2017 WL 480705, at *12 (Tenn. Ct. App. Feb. 6, 2017) (quoting *Runyon v. Runyon*, No. W2013-02651-COA-T10B-CV, 2014 WL 1285729, at *6 (Tenn. Ct. App. Mar. 31, 2014)). In the present case, the grounds for disqualification do not originate from extrajudicial sources. Thus, Father was required to show pervasive bias, reflecting "an utter incapacity to be fair." *Groves*, 2016 WL 5181687, at *5.

Father acknowledges that the trial judge correctly identified the appropriate standard for recusal not arising from extrajudicial sources. His position on appeal is that the trial judge did not actually apply the proper standard. To support this argument, Father cites the following statement from the judge's oral ruling: "I feel that I am prepared and will be fair to Mr. Woodward, and I feel that there is no basis to recuse."[11] According to Father's reasoning, this statement indicates that the judge based its decision on a subjective confidence in his own ability to be impartial rather than an objective analysis of whether there was a reasonable basis to question the court's impartiality. We disagree.

As stated above, Father in the present case must meet the higher standard of proof requiring him to show pervasive bias and "an utter incapacity to be fair." *Id.* A court speaks through its orders. *In re Adoption of E.N.R.*, 42 S.W.3d 26, 31 (Tenn. 2001). In its order denying the motions to recuse, the trial judge both cited and applied the appropriate standards. The court found that "the facts fully support this Court's decisions such that a reasonable person would not question this Court's impartiality upon review of the facts and record in this case." Further, as to the contempt proceedings, the court concluded that its prior statement "cannot be seen as reflecting an utter incapacity to be fair." The court's statement in the courtroom that "I feel that there is no basis to recuse" is not inconsistent with the application of an objective standard and does not show pervasive bias.

B.

Father also points to the court's ruling on July 14, 2023, regarding Dr. Spirko's testimony as evidencing the court's failure to apply the objective standard applicable to the determination of whether there was an appearance of impropriety. The order regarding the July 14, 2023 order was entered on August 8, 2023. According to Father's reasoning, the

---

[11] The court's oral ruling is quoted fully in section III.

trial court's failure "to address Dr. Spirko's false testimony so departs from the above [objective] standard with respect to its role as gatekeeper in this matter that any person of ordinary prudence would have no choice but to find that an appearance of impropriety exists." We disagree with this reasoning.

In fact, the trial court did address Father's argument that Dr. Spirko's testimony was unreliable and that she should be disqualified as an expert. The specific issue was whether Dr. Spirko's reference to audio recordings of the December 19, 2021 incident, which had not been recorded, called her credibility into question and justified her disqualification as an expert in the case. In its order, the court gave a thorough explanation of its ruling regarding Dr. Spirko:

> The Court . . . finds that striking an expert's testimony or striking an expert's report in their entirety is a major sanction. Dr. Spirko's report was lengthy and there were a number of people interviewed who provided Dr. Spirko information and insight into the parties' behavior. . . . The Court got an impression of Mr. Woodward from the beginning prior to her report being released. The Court has also taken notice of Mr. Woodward's behavior, which had nothing to do with Dr. Spirko's report or testimony. . . . The Court understands how Dr. Spirko might get confused about audio recordings she listened to as there were a number of recordings in this case. There have been numerous discussions regarding various incidents in this case. . . .
>
> The Court can understand why Dr. Spirko may have testified that Mr. Woodward was yelling because in other audio recordings she testified that she had heard him yelling. The Court is concerned, however, when Dr. Spirko refers to Mr. Woodward yelling in a non-existent recording based on the statements of Ms. Woodward and her son WEW, when there is nothing in her notes about Mr. Woodward having raised his voice or is yelling. Therefore, the Court is striking the description of the December 19, 2021, incident from Dr. Spirko's report and testimony given by Dr. Spirko about that incident.
>
> The Court shall give Dr. Spirko's report the weight it deems appropriate, reminding all that in addition to what Dr. Spirko says, the Court has heard testimony from Mr. Woodward during various hearings in this cause. Mr. Woodward has explained his position to the Court and stated that he does not really have any responsibility to try to make the children act respectfully towards their Mother, because they need to make up their own minds. The Court asked for Dr. Spirko's report to assist the Court in understanding what was appropriate resolution on issues of custody and parenting time for the minor children. However, the Court is not sure Dr. Spirko's report has much relevancy at this point. WEW is not participating in the programs that were recommended by Dr. Spirko and ordered by the

Court and neither parent has asked the Court to forcibly compel him to do so, nor would the Court consider such a request at this time.

The court decided to strike the portion of Dr. Spirko's testimony and report applicable to the December 19, 2021 incident but not to exclude all of her expert testimony.

In its order on Father's recusal motions, the court stated that "Dr. Spirko's small mistake does not amount to perjury, but a mere misstatement which the court dealt with in a measured response of striking" the portions of her testimony and report dealing with the December 19, 2021 incident. We agree with the trial judge that his decision was "a reasonable ruling given the facts and circumstances surrounding the issues, and one that was favorable to Husband." We further agree that "no person of ordinary prudence, knowing the facts of this case, would find a reasonable basis for questioning the Court's impartiality in this regard." The court's decision not to entirely exclude Dr. Spirko's testimony does not satisfy Father's burden of proving pervasive bias or an utter incapacity to be fair.[12]

III. Mother's arguments incorporated into court's ruling

Father's final argument is that the trial court's adoption of Mother's arguments in its order denying his recusal motion "creates an appearance of bias."

In *Smith v. UHS of Lakeside, Inc.*, 439 S.W.3d 303, 312 (Tenn. 2014), our Supreme Court addressed the importance of a court's exercise of independent judgment in arriving at its decisions. The obligation of judges to "arrive at their decisions by applying the relevant law to the facts of the case" is a "high judicial function." *Smith*, 439 S.W.3d at 312. Thus, "a court's decisions must be, and must appear to be, the result of the exercise of the trial court's own judgment." *Id.* A court's statement of reasons for a decision "reinforces the legitimacy of the legal process which, in turn, promotes respect for the judicial system." *Id.* at 313.

The *Smith* Court also discussed the United States Supreme Court case of *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 572 (1985), in which the high court considered the trial court practice of asking counsel for a prevailing party to prepare proposed findings of fact, conclusions of law, and orders. *Id.* at 314-15. The high court acknowledged "the potential for overreaching and exaggeration on the part of attorneys preparing findings of fact" after a favorable decision. *Anderson*, 470 U.S. at 572. Nevertheless, the United States Supreme Court declined to find reversible error because (1) the trial court had set forth its decision and its rationale for the decision in a

---

[12] As mentioned above, an appellate court's role in a Rule 10B appeal is to review the order on recusal, not any other orders. Father has the ability to challenge the court's evidentiary ruling in an appeal once there is a final order in the divorce proceedings.

memorandum opinion prior to requesting that counsel prepare proposed findings of fact and conclusions of law, and (2) the trial court reworked the proposed findings of fact and conclusions of law—in particular, the "crucial findings"—and adopted findings that "var[ied] considerably" from those proposed by counsel. *Id.* at 572-73. Therefore, the Court saw "no reason to doubt that the findings issued by the District Court represent the judge's own considered conclusions." *Id.* at 573.

Relying on *Anderson* and cases decided thereafter, the *Smith* Court stated that "the practice of trial courts receiving and using party-prepared findings of fact, conclusions of law, and orders" had been approved, though not recommended, under two conditions:

> First, the findings and conclusions must accurately reflect the decision of the trial court. Second, the record must not create doubt that the decision represents the trial court's own deliberations and decision. *Aiken Cnty. v. BSP Div. of Envirotech Corp.*, 866 F.2d 661, 677 (4th Cir. 1989); *Clady v. County of Los Angeles*, 770 F.2d 1421, 1427 (9th Cir. 1985); *Madden Phillips Constr., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 809-11 (Tenn. Ct. App. 2009); *Airline Constr., Inc. v. Barr*, 807 S.W.2d 247, 253-54 (Tenn. Ct. App. 1990). Accordingly, reviewing courts have declined to accept findings, conclusions, or orders when the record provides no insight into the trial court's decision-making process, *Trieschmann v. Trieschmann*, 178 Wis.2d 538, 504 N.W.2d 433, 435 (Ct. App. 1993), or when the record "casts doubt" on whether the trial court "conducted its own independent review, or that the opinion is the product of its own judgment," *Bright v. Westmoreland Cnty.*, 380 F.3d at 732.

*Smith*, 439 S.W.3d at 316. In the case before the *Smith* Court, the trial court granted several motions for summary judgment but failed to provide the parties with the basis for its decisions. *Id.* at 309. After a ruling in favor of Lakeside on two counts, the trial court stated "that it was leaving the 'basis for the ruling' or the 'rationale for the [c]ourt's ruling' to counsel for Lakeside." *Id.* at 317. The Court stated: "Because the record demonstrates that the trial court did not provide the basis for its decision prior to the preparation of the draft orders, the grounds stated in the order cannot be attributed to the trial court." *Id.* After another hearing at which the trial court decided to dismiss all remaining claims against Lakeside, "the trial court directed counsel for Lakeside 'to prepare the order and to establish the rationale for the [c]ourt's ruling in quite specific detail.'" *Id.* The Supreme Court concluded that "the record provides no basis for imputing the reasons included in the orders prepared by Lakeside's counsel to the trial court." *Id.* 317-18. Under the circumstances, the Court affirmed the vacating of the trial court's order and remand for further proceedings. *Id.* at 318. The principles announced in *Smith* have subsequently been applied to proceedings not involving summary judgment. *See, e.g.*, *Cunningham v. Eastman Credit Union*, No. E2019-00987-COA-R3-CV, 2020 WL 2764412, at *4 (May

27, 2020); *Mitchell v. Mitchell*, No. E2017-00100-COA-R3-CV, 2019 WL 81594, at \*7 (Tenn. Ct. App. Jan. 3, 2019).

Looking to the case before us, we find no basis upon which to vacate the trial court's order denying the motions for recusal. Prior to the hearing, Mother filed a response in opposition to Father's motions. At the hearing, the court stated its ruling and rationale from the bench:

> This Court having tried to consider it, looked at your arguments, looked at cases that you've cited, the Court is not going to recuse in this matter. And here are my reasons for that.
> All I know about these parties is what has been submitted to me in the pleadings, in the parties' testimony, in the witness's testimony, and in the experts' testimony, including Dr. Spirko's evaluation. All I know is what I've seen and read and things that I should have been seeing and should be reading and the testimony that I've heard in this courtroom.
> I want to remind everybody I did not pick Dr. Spirko to be the evaluator of these parties. Dr. Spirko was picked by the parents, and I simply agreed that she could prepare the evaluation. I have never worked with her before. I must say I was impressed at the detail in her evaluation, that it appeared that she had gone the extra mile trying to do a good job on it. It appeared to be very thorough.
> I also understand that Mr. Woodward is concerned based on statements I have made as this case has gone by for it seems like two years.
> . . . .
> This Court spent a large amount of time listening to experts testify, not just Dr. Spirko, but Dr. Freeman—I think Dr. Woodman at some point— I know he sat in court. I can't remember if he gave any testimony. My recollection is Dr. Kenner prepared a report also on behalf of Mr. Woodward.
> I gave the experts—Dr. Freeman and Dr. Kenner the Court's constraints. They were to look at Dr. Spirko's evaluation and not go outside that for the information and then see if they drew some of the same conclusions. Dr. Kenner did not comply with what the Court requested he do, and Ms. Woodward asked that the Court not hear this testimony. And, frankly, I would have been within my rights not to do that, but Dr. Kenner has been around this system for a long time. He's pretty good at what he does. I have to say he's been in other cases, and he always somehow managed to come up with a fresh look at something. And I didn't feel like it would be fair to Mr. Woodward if we forced his expert out and not allowed him to testify. So the Court, over objection from the mother, allowed Dr. Kenner to testify.
> For most of the period of time that we've actually been having hearings, you all will remember that these were generally the mother's

motion trying to get this Court to implement Dr. Spirko's recommendations. Frankly, I had concerns about that. I didn't know that it was the best thing for the young man we were dealing with. I didn't know if it was the best thing for these parties. This Court resisted Ms. Woodward's motions.

This Court put in place what I understood the child wanted, which was a 50/50 arrangement, and which the Court understood also that Mr. Woodward wanted too. I put that in place. I was disappointed at the young man's response to it. I thought that would solve some problems. I hoped that it would, but it didn't seem to. His behavior and his attitude toward his mother didn't seem to change.

Rather than throw all that out, the Court attempted to tweak it to make it work better hopefully for him. It still didn't change. So I resisted implementing it again, and it still didn't seem to work. And it was only the final—when we—I felt like I tried all I could try that I tried to implement Dr. Spirko's recommendations, even though I still wasn't convinced that it was necessarily the best thing to do, but it was at least an option. That hasn't been very helpful either.

So this Court's position is that it has been as fair as I know how to be to Mr. Woodward as we've gone along. I don't think anybody can dispute the fact that the Court resisted the mother's motions on two occasions, that the Court has allowed his expert to testify when the Court could have prevented him to.

And because I chose not to throw out Dr. Spirko's report and prevent her from testifying in this matter, it was determined at that point that sufficient evidence had accrued that I couldn't be fair. I think striking an expert—especially an expert picked by the parties—report is pretty heavy duty work. One would need really, really clear evidence. I didn't find that to be the case.

Dr. Spirko obviously testified to something that was incorrect. She had listened to a number of tapes, and she finally admitted that what she had written in her report—she didn't have a tape and what she had written in her report was not accurate—excuse me—what she testified to was not consistent with what she had written in her report. So the Court struck that portion of the report dealing with that December incident.
. . . .
So this Court—I feel that I am prepared and will be fair to Mr. Woodward, and I feel that there is no basis for this Court to recuse.

In response to a question from Mother's counsel, the trial court clarified that, "while certainly the timing is suspicious, the Court's position is that I don't have sufficient evidence to make a determination that [Father's motion to recuse] was done for improper purposes." The court asked Mother's counsel to prepare a proposed order "consistent with the Court's ruling today":

- 39 -

The Court agrees with the substance of your [Mother's] response, and I'm going to adopt the substance of it. If you will include the arguments that you put in your response and the information that I have mentioned and that you had mentioned and Mr. Weatherly [Mother's counsel in the contempt matters] had mentioned. I think it will all go as part of the totality of the circumstances.[13]

Mother's counsel thereafter submitted a proposed order to the court, which included the court's findings from its oral ruling as well as portions of Mother's response concerning the applicable law and its application to the facts of the case. In its final order, the court did not adopt the proposed order in its entirety. The court added several findings of fact to those included in Mother's proposed order and made significant revisions to the wording of many of the findings included in the proposed order.

Father asserts that "no person of reasonable prudence in Husband's position would be able to maintain confidence in the court's impartiality" and that the trial court's conduct "creat[ed] an impression that the court has either not considered Husband's arguments or has effectively ceded its decision-making responsibility to Wife." The applicable standard, however, is whether "'a person of ordinary prudence *in the judge's position*, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality.'" *Cook*, 606 S.W.3d at 255 (quoting *Liberty Mut.*, 38 S.W.3d at 564-65) (emphasis added). Moreover, in cases involving alleged bias not arising from extrajudicial sources, the standard requires proof of pervasive bias or a complete inability to be fair.

Father argues that the court's oral ruling and adoption of Mother's arguments "provides no insight into the court's decision-making process" and "further emphasizes the objective appearance of bias on the part of the court." We respectfully disagree. The court's partial adoption of Mother's proposed order meets the two conditions set forth in *Smith*: The findings and conclusions in the court's order "accurately reflect the decision of the trial court." *Smith*, 439 S.W.3d at 316. The trial court announced and explained its decision at the hearing and, in asking counsel to prepare a proposed order, expressed agreement with the legal principles from Mother's response. Second, the record does not "create doubt that the decision represents the trial court's own deliberations and decision." *Id.* The court's oral ruling and the revisions it made to the proposed order indicate that the trial court "'conducted its own independent review'" and that "'the opinion is the product of the court's own judgment.'" *Id.* (quoting *Bright*, 380 F.3d at 732).

---

[13] After the trial court's oral ruling, Mother's attorneys reminded the court of several other facts supporting the court's decision: allowing Dr. Mercer to testify over Mother's objection and dismissing several counts of Mother's contempt petition at Father's request.

CONCLUSION

The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellant, Geoffrey Hamilton Woodward, for which execution may issue if necessary.

_/s/ Andy D. Bennett_____
ANDY D. BENNETT, JUDGE